John Smeltzer v. United States There are numerous issues in this appeal and two cross appeals. Subject to questions from the Court, I would like to focus my time now on the government's appeal from the CFC's statutory use restriction claims and reserve argument on the cross appeals until my rebuttal argument. Your Honors, the CFC erred in granting summary judgment on the use restriction claims for two reasons. First, the plaintiffs failed to state a viable cause of action under the Tucker Act or the Indian Tucker Act. And second, because the use restriction claims were barred by the statute of limitations. First, with respect to the failure to state a claim, the use restriction claims are premised on appropriations acts that were enacted in 1888, 1889, and 1890. Did the Federal Circuit, when the appeal first came up to us, did the Federal Circuit reserve the land use restriction arguments for further development? This Court, after it heard the first argument, noted in a footnote that it had not resolved the dispute that had arisen between the parties, and that is the dispute that led to the amendment to the complaints and to the raising of this new challenge, and that's exactly the challenge we're addressing. The footnote said the Court would address the lawfulness of the distribution of land revenues to the extent necessary, or that the CFC should address it to the extent necessary on remand. And we submit that that issue, the lawfulness, actually never needed to be addressed because the use restriction claims, by their nature, were not money mandating. They didn't raise a money mandating duty under these appropriations acts, and again, because they were barred by the statute of limitations. With respect to the Tucker Act and the Indian Tucker Act, what the Court needs to keep in mind here is that restrictions that applied to the original appropriations also applied to these land revenues that were generated many years later. But the statutes themselves, of course, say nothing about and don't even anticipate that there would be future revenue derived on these lands. What happened was the Appropriations Act authorized the Department of Interior to purchase, for the benefit of individual Indians, who we are now calling the 1886 Medwoketans, who had renounced their affiliation with Medwoketan Band, which had been banished from Minnesota at the time. And the Appropriations Act was for the Department of Interior to expend funds for the purchase of lands, livestock. You're referring to the 1889 Appropriations Act, correct? All three of them, altogether, appropriated approximately $40,000, again, for the purchase of items for the benefit of individual Indians. When I look at those acts, I see words such as shall mentioned a number of times, and it's clear that the Secretary was required to expend monies and to undertake other affirmative obligations. How do you score that with your argument? Well, two things. The principal thing, Your Honor, is the shall. The shall does arrive in certain provisos of the act, but again, it applies to the initial appropriations. Shall expend funds for the benefit of these individual Indians on land, livestock, supplies. Some of that money is spent on behalf of individual Indians to purchase land. Many years later, between 1950 and 1975, long after the individual beneficiaries had passed, the original beneficiaries of these lands, these lands were unoccupied, and the Secretary leased the lands, generated additional revenue that the Secretary then determined could be appropriations, that is, for the benefit of individual Indians who fell within this class. But at that time, then, there's no mandate anymore to spend it in a particular way. There was no requirement to even lease the lands to acquire revenue. There was no obligation in the act to even hold the lands, hold title to the lands, so he could lease the lands. So what we're telling the Court is, essentially, the statute should be read as providing broad discretion on the part of the Department of the Interior to manage these lands, to generate revenue, and to use them for the benefit, the original purpose of the act, which... I have the advantage of having heard some of this before. Yes, yes. And didn't we pretty much say that in our earlier opinion? Well, the first opinion was about whether there was an implied trust. And they said there was not. And the Court said there was not. And that is the remarkable thing about our being back here today. This is a gratuitous appropriation under the Quick Bear. Essentially, it was an ordinary appropriation, is what the Court said. And, again, what we're dealing with here is not even the initial appropriation, but additional funds that were generated many years later under no statutory direction. There's no jurisdictional hook here. How do we get back here? Well, there is no jurisdictional hook, because there's no Tucker Act claim, there's no Indian Tucker Act claim, because there is no money mandating duty. There's no mandate. First, you have to find a mandate in the statute. And, of course, the statute is completely silent about these land revenues, completely silent about descendants. What the Department of Interior determined was it had authority to spend, to lease the lands and then generate revenues and, ultimately, to distribute revenues for the benefit of individual Indians who fell within these classes. Can I ask you a question that is still on your appeal, but I guess is, if it's relevant at all, is relevant, I think, to this statute of limitations. It's maybe more a factual question than anything else. When you all distributed the money in 1981 to 1982 out of these treasury accounts, which I guess were called trust fund accounts or just trust accounts? Designated trust accounts. Do those accounts get closed? I believe so, Your Honor. Okay. And on the affirmative claim, are we talking about $674,000 to be divided, or divided is not the right word, but split among 20,000 claimants? On that particular claim, is that what's at stake? That would seem to be the import of the CFC's ruling, Your Honor. The CFC suggested that this equal value proviso from the original appropriation somehow applies to the revenues, which with interest now amount to that $600,000. Let me shift gears, and I'm not quite sure what claim or counterclaim this question applies to, and that is the matter raised in the request for judicial notice and whether the three communities that were granted tribal status or anyway recognized as organizations in 1935 right after the 1934 Indian Reorganization Act were properly so recognized under Carcieri. Now, I guess I have a couple of related questions. I'm not quite sure what relevant, if any, that comes from, and why is that? I mean, I would think that the land that Congress specifically, or the funds, I'm sorry, that Congress specifically provided to give them in the 1980 Act, that that's okay because Congress can say give certain money to presumably unorganized tribes. But there are about 1,000 or 1,500 additional acres that were given to these, or taken into trust for these communities before the 1980 Act. Is that relevant at all here, and is that potentially problematic under a challenge to the 1935 recognition of these three communities? Well, Your Honor, this case is not a challenge to the recognition of the tribal communities, and we're getting somewhat far afield from the challenges that were brought. I want to answer your question. It's a very open-ended question of what relevance. Suppose it were correct that these three communities could not properly have been recognized under the 1934 Act. What then? Maybe you're not the right person to ask the question. I'm genuinely confused about what relevance. Nothing for purposes of this case, Your Honor, and here's the reason. This case began to some extent because of the footnote in the prior opinion, footnote 14, which said, again, that there was this issue about the lawfulness of the distribution of the land revenues. Ultimately, even if the land revenues weren't lawfully distributed, that doesn't mean there's a cause of action under the Tucker Act or the Indian Tucker Act on behalf of the group of the descendants, as a group, to have this money paid out, as you said, divided in 20,000 ways for all the descendants, wherever they may be found. Is there some other form, either current or future, in which this challenge to the three communities' recognition in 1935 and 1936 is being or can be litigated? Your Honor, I'm not aware of any particular mechanisms to challenge something, a recognition event that happened many years ago. But again, to have a cause of action here, these plaintiffs need to point to a money-mandating duty in these acts that they've alleged are the basis for their claim, the 1888 through 1890 Appropriations Act. And there's just nothing in there that would mandate the payment of unanticipated future revenues to all descendants, wherever they may be found, at any time revenues are generated. The much larger claim or set of claims that's at issue here, assuming you're right about this $674,000 being the extent of the claim that the Court of Federal Claims recognized, are on the counterclaims. That's a lot more than $674,000. Can I just ask you this about one of those? And I realize we're getting into the cross-appeal. And I want to focus on one specific, one of those counterclaims. And that is the one that says, not the first sentence of the February 1863 Act, Section 9 of the February 1863 Act, but the second sentence. The claim that enough was done by Interior in the spring of 1865 to make the second sentence applicable. The second sentence, whatever else it is, once it applies, is not discretionary. It says, shall take into account. I don't know that the Court of Federal Claims specifically addressed that, except in the takings context to say that there is untimeliness. So I guess my ultimate question about that particular claim is, if we were to agree with the untimeliness ruling about any challenge to the entitlement to the 12 sections. On the factual notion that the 12 sections were conveyed? Yes, yes. On that assumption, does timeliness completely dispose of everything that they are claiming based on the second sentence of Section 9 of the February 1863 Act? Your Honor, I would think that the statute of limitations would have run on, because those lands were ultimately sold, the only part that wasn't sold were the very small 4.8 acres that they've raised in the libraries, which there's not even any indication where that 4.8 acres are. But I want to come back to just the… If it turns out that that's where the casino is, do we have a problem? I don't believe so, Your Honor, because I think that they were on notice that they were not getting these 12 sections, presumably the argument was were set aside. But coming back to the first sentence, really, the first sentence said that the Secretary is authorized to set aside land in severalty to individual Indians. There's no way that the preliminary act of just making sure that we haven't sold this group of land yet, while we think about whether we're going to assign these lands in severalty to individual Indians, somehow amounted to a grant or a conveyance of land. We also found that that February Act was superseded, right? With respect to reservation lands, the March Act doesn't have that second sentence with the language about… With respect to the reservation lands, yes, in terms of the authority to provide lands, the March Act is the one that applies. I don't see how the March Act, in a relevant sense, superseded that section of the February Act. The only supersession that I can see, and supersession was mentioned as a passing matter in the background, that wasn't in fact the issue the last time the case was… That's true, that's absolutely true, Your Honor. There's one thing that the March Act does, it says no Indian shall get more than 80 acres. Yep. And so, in that sense, it placed a limit on what could be given under Section 9 of the February 1863 Act. I don't understand how otherwise it could displace the Secretary's authority under Section 9. It's the lands that are addressed by the two acts. The February Act talks about the ability to, the authorization, the may, the Secretary may provide lands from the public lands not otherwise appropriate. And why would that exclude public lands, exclude lands that were either soon to become, or maybe already were public lands within the old Civil Registration Act? The suggestion is, of course, because the Congress didn't deal with the 1858 Sioux Reservation in the February 1863 Act, that public lands not otherwise appropriate was referring to something else. But here's where you get the superseding. Even if that's not the case, in the March 1863 Act, the Congress made it clear. They said, look, if there's some concern about what public lands mean, we are saying in March 1863 that it shall be lawful to place these displaced Indians on former reservation lands. That's the first time they addressed the former reservation lands. They specifically say former reservation lands, and in that Act they specifically say subject to any tenure. There's no longer the second sentence. So the only Act that specifically addresses the reservation is the second Act. But why would you say that the Act that specifically addresses it supersedes one that is more general and therefore encompasses it? We don't argue that, Your Honor. We don't argue that it supersedes it in entirety. We argue that the Act needs to be read in common in our briefs as a whole. And with respect to the reservation, they are making demands to reservation lands. They are saying that because these preliminarily set-aside lands that were on the reservation were preliminarily set aside, they had to be set aside in perpetuity. In the spring of 1865, the Secretary specifically invoked, did he not, Section 9 of the Federal Act? Section 9 and Section 4, Your Honor. He specifically invoked both. And Section 4 is the one that says former reservation lands, and Section 4 is the one that says under any land tenure, and there is no document, there's no grant, there's no specific piece of paper that says we are hereby giving you these lands under whatever the land tenure is. Because, of course, the idea was to give the lands to individual Indians. And they were never assigned to individual Indians, so we don't know what tenure would have been provided. But they certainly did not provide grants to individual Indians in severalty pursuant to the February 1863 Act. What is the fallout that the government fears in this case? I mean, it seems to me that the Court of Federal Claims that the party stipulated to money damages of $670,000 or something like that. Correct? That's correct, Your Honor. Stipulated that that would be the amount of damages if the judgment was correct. That would be the amount of damages. And we've got reams and reams of paper. I mean, we've got an immense amount of litigation. This is probably going to go to Supreme Court. We're talking about $670,000 over an act that was passed in the 1860s. Is there something that you fear? I mean, what is it that the government fears? Why don't you just pay the $670,000? I mean, that's one question. My next question goes back to the historical context of the Appropriations Act. I mean, it seems to me that the plain reading of the statutes is that the secretary was to get certain monies and to provide for the loyal Indians. I don't think that's ever happened. And your argument is that, well, the secretary had discretion as to what they were going to do with those monies. But what I'd like to hear is what is it that the government has done to satisfy what I view to be the plain reading of the statute, that the original intent was to provide for the families of the descendants of the loyal Mekwetilam Indians. That's a lot of questions. Let me try to back up and stop me if I miss one. First, why don't we just pay it? We don't pay it because it's not out. The law just doesn't obligate the United States. There's no mandate. As we've described in the briefs, and the claim is barred. In terms of what is the government's fear, the cost of actually figuring out whether those 20,000 alleged claimed descendants actually are descendants will probably dwarf the judgment. And there's a ton of administrative work that would have to be done to do that. Can't you just divide 670,000 by 20,000? Your Honor, the government's not in the business of just paying people on the basis of an allegation. The Department of the Interior would have an obligation, if this is the right judgment, to figure out who is actually a descendant. And that requires checking every one of the claims. It's not required here because the claim is barred and there is no claim. But with respect to the context of the action, you suggested that the Secretary of the Interior, Department of the Interior, didn't fulfill the obligation under the appropriations. But again, the appropriations were for these people in a particular historical context. They were ordinary appropriations, as this Court has said the last time. The appropriations did not create a trust. There's nothing in there that says they were to provide for future descendants, future generations of these Indians. And there is no claim in this case that the Secretary of the Interior did not fulfill his duty at the time, in 1888, in 1889, and in 1890, in providing all of the appropriated funds to these individual Indians. You're not arguing that even if there was an obligation on the Secretary back in 1860, that obligation no longer exists because over 100 years has lapsed. What we're saying is there's no complaint in this case that the original appropriations weren't fairly provided to all of the beneficiary class. And you talk about the descendants. The statute says, or families. We talked about there are some shells in the statute, but there's one, in principle, or. And the or is when it talks about families. And in context where it looks like a one-time appropriation, the suggestion is that, yes, the Secretary has discretion at that point to also help and provide for families. It can't be turned into a mandate to provide for future generations for perpetuity. It's stretching the statute. Thank you, Mr. Meltzer. I think you've consumed your time. Thank you. Mr. Cardall? May it please the court, my name is Eric Cardall, and I'm arguing for the Wolfchild plaintiffs. Can you tell me, after this court earlier said that the best interpretation of those statutes is that they merely appropriated funds, if we've said that, then isn't this case pretty over? Except that it was subject to a statutory use restriction. And as this court indicated, the 1980 Act did not repeal the Appropriation Acts. So as Judge Letell ruled, the statutory use restriction existed. That statutory use restriction protected the rights of these people and their lineal descendants in this court. And where's the money mandating statute? As I argue in my brief, Your Honor, when you sent us back on remand after very narrow certified questions, I was allowed then to bring forward my second claim. I had another dog to put in the fight. And that other dog was, of course, that in 1935, it was like yesterday, Judge, I was talking to you, I said in 1935 the die was cast. And I said that to you. And you wrote your opinion. You remanded me. And the die that was cast was, according to four memos of the United States Department of Interior, it was recognized prior to the communities being recognized that these were reservations. And so how could they have been reservations but for this group of lineal descendants? And if you have a reservation that's reserved for a group of lineal descendants, then you're protected under the Indian Non-Intercourse Act. And President George Washington said the purpose of the Indian Non-Intercourse Act was to assure that our Indian groups would not be defrauded. And so, Judge, under the Indian Non-Intercourse Act... And where is the money mandating statute? We've got to have jurisdiction before we can act. Right, Your Honor. You're giving me kind of some broad justice arguments, which are quite compelling, but I'm trying to figure out where our jurisdiction is. Well, Judge, under the Indian Non-Intercourse Act, there was a series of cases, including Oneida Nation, and just a slew of cases, because the federal government that sits here today had not protected Indian tribal land rights. And under the Oneida Nation case, damages were awarded for a violation of the Indian Non-Intercourse Act. Congress, in many cases, has resolved these cases by statute, awarding damages for violations of the Indian Non-Intercourse Act. I could think of no statute that more clearly provides the money mandating duty. On the 1863 Acts and the Appropriation Acts, I stand on the argument, but clearly, with respect to transferring a reservation to third parties without congressional authorization, nothing could call for that inference more than a violation of the Indian Non-Intercourse Act. So if this court is going to shut down Indian Non-Intercourse Act claims with respect to a money mandating duty... I'm sounding like I'm repeating myself, but haven't we already found the Appropriating Acts, or simply that, Appropriations? And therefore, Quick Bear tells us there is no trust, there is no money mandating statute, there is no jurisdiction. Help me out. Can you point me to a statute that gives you jurisdiction? Yes, I already pointed to one, the Indian Non-Intercourse Act. So that's a statute, the Indian Non-Intercourse Act. It was enacted by Congress. It's been amended several times. It's gone to the U.S. Supreme Court. Damages were awarded to the counties, against the counties, for violation of the Indian Non-Intercourse Act. So you could draw an inference that when the United States transfers a reservation to groups that aren't authorized by Congress to receive it, that that's a money mandating... I mean, if you take a reservation that's been reserved for a group of Indians, and you give it to another group of Indians, and the Indian Non-Intercourse Act says you can't do that, imposing an affirmative obligation on the United States not to transfer reservations willy-nilly to subgroups, yes, there's a money mandating duty, and that's a statute, Your Honor. And you asked me to ask... Where is the money mandating duty? The inference can be drawn from the Indian... The inference. You know that the trouble with the Tucker Acts is that they are closely associated with sovereign immunity,  It has to be very explicit and doubly underlined in a statute before we can give it any credibility. Well, the U.S. Supreme Court is a credible institution, and it's affirmed judgments against counties for violating the Indian Non-Intercourse Act. And so we have Supreme Court precedents granted through the U.S. District Court, and I understand the distinction, but we shouldn't just write off the U.S. Supreme Court in the progeny in the U.S. District Court regarding the Indian Non-Intercourse Act. I think it needs to be studied. But the Indian Non-Intercourse Act claim was rejected by the Court of Federal Claims on the grounds that whatever else your collection of claimants is, it was not at the time of any alienation and is not today a tribe within the meaning of the Indian Non-Intercourse Act, because it does not, as a single unit, have any kind of cohesive governmental or comparable structure. Right. There is a problem with the litigation below, and that was that it was bifurcated. The decision came back, and we were just supposed to argue the 1863 Acts. So in fairness to Judge Letow, the whole case has been put in now in a slightly different way. And I think when you look at the 1935 memos, and you see, and Judge Letow didn't consider this, you see that the reservation was reserved for the 1886 Milwaukee group prior to the communities being recognized. The carcieri, all the carcieri's debated on what did interiors understand in the Indian Non-Intercourse Act at the time of the Indian reorganization. There was no land conveyed away from them. There was no, there's kind of two problems. There's the problem that Judge Toronto points out, that they weren't a tribe, but isn't there also the problem that there's no land taken from them? Well, Judge. So you've got kind of two strikes under the Non-Conveyance Act, and I'm not sure that that's a money-mandating statute anyway. Judge, we just got to read the government's memos. In 2012, they're saying that, sure, the Midewakern Band was under federal jurisdiction in 1934. These are wonderful justice arguments kind of giving broad policy, and I would announce that there is no area where the United States has a more embarrassing record than its Indian rights policies. But we have to have jurisdiction. You have to show me where this court has any authority to act. Well, Chief Judge, with respect, when I go to the legal history, just like the sciences to the patent cases, the legal history is facts with respect to the Indian history here. And so when you say these are policy arguments, it's not policy. I'm not interpreting legal issues. These are facts. It was a fact that the 1886 Midewakern Group was deemed the beneficiary of the reservation by the Department in 1935. That's not policy, Judge. That's a fact. And so I was here four years ago, and I explained to Your Honor, I said, the die was cast in 1935 that the 1886 Midewakern Group is the beneficiary of a Native American reservation. Can you think which specific 1935 Bureau of Indian Affairs or Department of Indian Affairs document do you think is the one that helps you the most? They're cited in the brief, and one 1935 memo. Well, there was the one from Felix Cohen. Yeah, the one from John Collier. Right, and I thought that maybe I have to look at that. I thought what they said is we will recognize one or more organizations here, but we can't do it because they're a tribe because they're not. We instead can do it, they thought, because there were reservations. Now, maybe that's correct or incorrect under Carcieri, but they didn't say that there was an organized tribe at the time. They said we can't recognize it on that basis because there isn't. No, the argument that I have made under the INIA is that the word tribe is undefined, and I think the best argument, definition, meaning the court could give for tribe under the Indian Non-Intercourse Act is a group of Indians with vested reservation rights. And so if that's true, if you would accept that, then in 1935, as I told Chief Judge Rader four years ago, the die was cast. And so under Carcieri, which is consistent with the contemporaneous documents at the time, Interior, when the General Allotment Act was repealed by the Indian Reorganization Act, sat down and said, is this reservation and is this Indian group the beneficiary of the reservation? And Interior said over and over again, yes, yes, yes. Under Carcieri, subsequent groups consistent with the 1938 solicitor's opinion, the subsequent groups were communities with delegated powers by Interior. They're creations of Interior. Now, Judge Rader, respectfully, if you were to take this opinion and you were to go back to the 1980 Act, which you helped write, you may conclude, well, my interpretation of the 1980 Act turns on whether these communities are simply creations of Interior rather than statutory identified entities. And if that's the case, then there's only one tribe. That's my client. There are not three tribes, and the court needs to wrestle with that. Is there one tribe or three tribes? My position, Chief Judge Rader, is that we have one tribe in all the statutes, but in favor of that, particularly if you view, and I vehemently disagree, that when the reservations were put there in 1935, that was an implementation of the February 1863 Act. The government's saying, oh, you have to have a writing when you reserve the land that says, I'm doing this under the February 1863 Act. Your Honor, now would you like to save some time for Mr. Montana? Yes. Thank you. Mr. Montana, you have five minutes. Please, the court. Good morning. My name is Gary Montana. I'm here on behalf of the Julia DuMars group as well as cross appellants. From my involvement in this case since 2006, I viewed it as a case that began with the February 16, 1863 Act. This court has held that the March Act, March 3, 1863, somehow superseded the February Act. Judge Leto, in his opinion, felt that you misread that and that was not true. And I'm here as well to reiterate that, that I believe that is not true. There's clearly nothing in the March Act that would say that it somehow repeals or abrogates or changes the intent of the February 16 Act. Just as a matter of judicial policy, does Judge Leto have the authority to say this court was wrong? Well, he did, Your Honor. He just said that you misread the statutes is basically what he said. And he cited some fairly convincing case law indicating why he felt that he had. One of the cases is Cathedral Candle Company v. United States, where it said that the Supreme Court has frequently explained that repeals by implication are not favored and it has instructed that where two statutes are able to coexist, it is the duty of the courts, absent a clear expressed congressional intention to the contrary, to regard each statute as being viable. And that's a Supreme Court case and you cited it here in this court. I see nothing in these statutes that would indicate that they cannot coexist. You know, both of them allot lands to meritorious or loyal or friendly suit. The second act, I believe, deals with the hostiles and locating them off and outside the reservations of Minnesota into Dakota territory. But it does also address in section four of that act the issue of the meritorious Indians and their compensation. So clearly both acts have never been repealed. They were not repealed by the 1980 act. They're still alive and well. I don't think this court or any court can point to any substantive law out there or statute that indicates that either one of these statutes have been repealed or have been superseded or somehow been done away with. They're still good law. And as to your question of money mandating, I would say the appropriation acts, numerous ones that followed the 63 acts, clearly were supported by the enabling act of the February 16, 1863 act. And from those appropriation acts, you have the basis of a money mandating statute, which is the 1863 act of February as well as March. So clearly there's a money mandating duty here on the federal government. And as a Native American attorney, I'm tired of always coming to these cases and always finding a court somehow finding some reason to getting out of giving us justice and equity as Indian people. Clearly this uprising of 1862 was brought about not by the Indians themselves, although they did commit an uprising. It was brought about by the federal government violating the statutes, not appropriating the monies they promised to them. They were starving to death. So the proximate cause of this uprising was not the Indians themselves. It was the federal government. So I believe, you know, it's an injustice to the loyal Mdewakanton, the friendly Mdewakanton, not to recognize the fact that clearly the statutes, the language of the statutes coupled with the legislative intent on the floor would not indicate that they should have been given 80 acres each to the meritorious Indians. So if you have any questions, obviously. Can I just ask I guess the same question I asked of government counsel? If we were to agree with the court of federal claims on the untimeliness of the taken claim, a claim that rests on Section 9 of the February 1863 Act, is there anything left to your, to any claim you have based on Section 9 of the 1863 Act, the second sentence of Section 9? As far as the allotting of the 80 acres is theirs forever? Yes, right. You have one claim under the first sentence that says it's mandatory enough. I want to put that aside. I want to focus just on your claim that enough action was taken in the spring of 1865 to constitute the setting apart in severalty, which would then trigger the second sentence, which by its terms is anything but discretionary. I would agree. But the court of federal claims said to the extent that you allege that was a taking, namely the selling of those lands later, that's been time barred for 100 years. My question is if we agreed with that untimeliness ruling, is there anything left to your claims that rest on the second sentence of Section 9 of the February 1863 Act? Other than the fact that they didn't comply with the second sentence of the February Act. The untimeliness conclusions assume breach. Right. But you can't do anything about them if they're untimely. So is there anything that would be timely about some other claim you have resting on that that would nevertheless be? Well, there's never been an accounting, obviously, so timeliness would not be brought into an issue under the Indian Tucker Act, obviously. So there's never been an accounting. In the March Act, which I've argued on numerous occasions, talks about the trust to have an accounting. Well, I believe this court indicated in their Wolfchild 6 opinion that there was. It says, further the court held, the February 63 Act language clearly would have created an inheritable beneficial interest in the recipients of any land conveyed under the statute. That's Wolfchild 6, page 1241, and that was this court that ruled that. So basically, assuming that the February Act is good law, you yourself have said there are beneficial interests in the recipients. Shall we hear from Mr. Zethier? Yes, sir. Thank you very much. Mr. Montana. Is this the court? My name is Robin Zethier. I'm here on behalf of the Zethier Group, as well as all the other plaintiffs that are joined in our arguments. Judges, I'm here to specifically address our treaty arguments that we proposed before the CFC. I'm stating back historical-wise to the 1851 and 1858 treaties that gave rise to the obligations of the United States and the Midewakern people as signatories of that treaty. Now, when the uprising occurred in 1862, there were certain elements of the Midewakern people, the hostiles that took part in the deprivations. However, the friendly loyals or loyal Midewakerns that we speak of did not. When the government took action on the February 16, 1863 Act, they did an across-the-board abrogation and annulment of all treaty rights and remedies, including all annuities and the land. So when the discussion occurred during the debate in the Senate by Senator McMillan, who was a Minnesota resident, he looked into the future and said, hey, if we do this, if we abrogate and annul all these treaty rights for everybody, including the friendlies, aren't they going to come back and ask for their treaty lands back or their annuities? And he was right, because that was the actual reason why Section 9 of the 1863 Act was enacted, was to counter that abrogation, the totality of it. So when I say that this is founded in the treaties, Judge Leto at the CFC agrees with that. We have raised this issue. Contrary to what... I just want to understand. In Quickbear, I think it was Quickbear, or one of the places, there was a distinction made between acts that are implementation of a still valid and operational treaty obligation, paying over the course of many years through appropriations, and other things. We don't have that, because you're talking about a treaty that was, as you said, as fully abrogated and annulled as it's possible to do. Absolutely, Judge. And the importance of that is that the 1851 treaty carried annuities forward into the 1858 treaty. There were annuities that were still owed to people. So when the February 16th of 1863 Act took place, and the senators took into account that fact, that we're abrogating the entirety of it to all people, the land, the 80 acres, was directly analogous to that. Now when we talk about the annuities, those were put into a trust fund. That's your trust fund assets that existed from 1863 that this panel has decided back in 2009, created an inheritable beneficial interest in the people in Section 9. So when we talk about the fact that there is a breach of a treaty, the people that caused the uprising surely breached the treaty. It was a peace treaty. But there was also a breach on behalf of the government that continues today. That breach has never been remedied. When Congress has expressly annulled and abrogated, I think are the words, the treaty, in the absence of some pre-annulment vesting of a property right, which would then be protected as a property right, how does anybody derive any rights out of that treaty after it's been annulled? Well, you have remedies. If the court would take judicial notice of the United States v. Sioux Nation of Indians case, in that case the Court of Claims that acted in 1979 was charged with the duty to determine an evidentiary record as to whether or not the treaty violation occurred. They opened up the evidentiary record in that case to determine that, to allow the evidence to flow. The Court of Claims did decide that there was a treaty violation in the Black Hills situation. They determined that that was a case of the most dishonorable rank dealings that this country had ever seen. But this is analogous to what we're dealing with here. These folks that we speak of, the loyal Mdewakantans, are our ancestors. The lineal descendants of those people have stood here before the court for decades, for hundreds of years, asking for justice. There's never been anything done on behalf of the government. They tried a piecemeal legislative approach with these Appropriations Acts, which was basically crumbs. And here we are arguing today, we need the CFC to revisit the case on the issue of the breach of the treaty by the United States, because then the 1863 Act will be seen for what it was. It clearly was an answer, a money-mandating duty statute that existed to right the wrongs. Judge, I'd like to just say... I think your time's about done. Do you have a final thought for us? Yes, I just would encourage the court that although this case has taken a long time, time should not measure justice. And if it requires us to go back in front of the CFC, we encourage that to develop the evidentiary record on the treaty argument, because that is so encompassing to the carry forward to the present day of the ancestors of these people. Thank you. Thank you, Mr. Zephir. Now, Mr. Smeltzer, you used your time, but we gave some extra time to the other side, so we'll give you a minute of rebuttal. Thank you, Your Honor. I think Mr. Zephir just acknowledged that there really is no treaty claim. There's only a claim under the 1863 Act, or the 1863 Acts. With respect to those acts, again, we would just submit that as the CFC correctly found, neither of them have a money mandating duty. Even the first is just an authorization to provide lands. But if we're talking about the specific lands, the lands that they keep talking about in their briefs, the 12 sections of lands that were preliminarily identified as potential lands for these Indians, those are specifically governed by the more specific statute, the one that talks about the former reservation lands. And the language in the March 1863 Act is much broader and clearly doesn't impose any sort of mandate to maintain lands for future generations. Can I ask you a question that I guess follows up on the plaintiff's argument, as I understand it? We said in the 2009 opinion that the lands purchased with the 1888-90 Appropriations Act came to be, I think our language says, regarded as reservation lands. Why is the set of beneficiaries for whom those reservation lands were reserved not a qualifying plaintiff under the INIA? Are you saying that they might be, or what? Your Honor, there's all sorts of problems with the INIA claim. I just want to focus on that one. I know that you gave about four arguments, of which the last was it's not a tribe. Now that happened to be the one that CSC actually relied on, which makes it tempting to focus just on that one at least first. So just focus on this question. Is the set of beneficiaries of lands that we said were regarded as reservation lands a tribe? They were regarded as reservation lands for the three communities who organized the lands, Your Honor. I mean, they were never regarded as reservation lands for the 1886 Mdewakanton. And this court found that the 1888-1890 Acts did not create a trust duty. And this court specifically said they did not create a reservation in Wolfchild, in his previous opinion. A land taken in trust is essentially synonymous with a reservation, and that's another point that this court made in its previous ruling. And I acknowledge there's tension, Your Honor, between the Department of Interior's determination in 1935, after the Reorganization Act was passed, that the individual Indians that were living on these contiguous lands that were not held in trust, but were held in this unique system under these statutes, could organize as tribes based on the notion that these lands were reservations. I acknowledge there's tension there, Your Honor, but it has nothing to do with the merits of the use restriction claims, the 1863 Acts, or any of the Tucker Act claims that are being brought here. It's a historical dispute between the 1886 Mdewakantons who stayed in Minnesota and those who went elsewhere. And that dispute is not before this court. Thank you, Mr. Schmelter. Our next case today will be